# UNITED STATES OF AMERICA
# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,              No. 1:20-cr-00103

     Plaintiff,              Honorable Paul L. Maloney

v.              **MOTION TO SUPPRESS STATEMENTS**

BAOLI YANG and
JIE YU,

     Defendants.

_____

## ORAL ARGUMENT REQUESTED

Jie Yu, through her attorney Mary Chartier of Chartier & Nyamfukudza, P.L.C., and Baoli Yang, through his attorney Patrick O'Keefe of O'Keefe Law, P.L.L.C., respectfully request that this Court suppress the statements that Ms. Yu and Mr. Yang made to the police before and after their arrest, or, alternatively, hold a suppression hearing. This is a supplement to the motion previously filed by Mr. Yang.

              Respectfully submitted,

12/11/2020              /s/MARY CHARTIER
Date              Mary Chartier

12/11/2020                          /s/PATRICK O'KEEFE
Date                                Patrick O'Keefe

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,       No. 1:20-cr-00103

     Plaintiff,               Honorable Paul L. Maloney

v.                         **BRIEF IN SUPPORT OF**
                              **MOTION TO SUPPRESS**
BAOLI YANG and             **STATEMENTS**
JIE YU,

     Defendants.

_____

Jie Yu, through her attorney Mary Chartier of Chartier & Nyamfukudza, P.L.C., and Baoli Yang, through his attorney Patrick O'Keefe of O'Keefe Law, P.L.L.C., file this brief in support of their motion to suppress their pre- and post-arrest statements. In support of their motion, Ms. Yu and Mr. Yang provide the following analysis.

## STATEMENT OF FACTS

The indictment charges Ms. Yu and Mr. Yang with count 1, wire fraud, 18 U.S.C. § 1343, and count 2, computer intrusion causing damage, 18 U.S.C. § 1030(a)(5)(A). (Indictment, RE 1, Page ID # 1, 5.) Both counts begin on or about April 27, 2019 and go through May 17, 2019. (Indictment, RE 1, Page ID # 1, 5.)

# ARGUMENT

I.   **The statements that Ms. Yu made after she was arrested must be suppressed because there was no valid waiver of her *Miranda*[1] rights.**

Statements obtained by law enforcement in contravention of the Fifth Amendment are not legally admissible and must be suppressed. The United States Supreme Court has specifically stressed that it is the custodial nature of an interrogation that triggers the necessity for adherence to the specific requirements of its *Miranda* holding. *Beckwith v. United States*, 425 U.S. 341, 346; 96 S. Ct. 1612; 48 L. Ed. 2d 1 (1976). When a person is questioned immediately after being arrested, that is by nature a custodial interrogation. A defendant in custody may not be subjected to police interrogation unless, before the interrogation, she has been provided with *Miranda* warnings and validly waived her *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 444; 86 S. Ct. 1602; 16 L. Ed. 2d 694 (1966).

## A. Because Ms. Yu was not read her *Miranda* rights in her native language, she did not knowingly and intelligently waive her rights.

In order for a person to waive her *Miranda* rights, the waiver "must not only be voluntary, but must also constitute a knowing and

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444; 86 S. Ct. 1602; 16 L. Ed. 2d 694 (1966).

intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482; 101 S. Ct. 1880; 68 L. Ed. 2d 378 (1981) (citation and quotations omitted). To satisfy the knowing and intelligent burden, the government must establish that, under the totality of the circumstances, the person had a full awareness "of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421; 106 S. Ct. 1135; 89 L. Ed. 2d 410 (1986). The government bears the burden of proving that the waiver was valid by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168; 107 S. Ct. 515; 93 L. Ed. 2d 473 (1986). This Court must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464; 58 S. Ct. 1019; 82 L. Ed. 1461 (1938) (internal quotations omitted). If the waiver is not voluntary, knowing, and intelligent, the fruits of the interrogation cannot be used against the accused. *Edwards*, 451 U.S. at 485 (1981).

"It is settled law that language difficulties may impair the ability of a person in custody to waive [his *Miranda*] rights in a free and aware

manner." *United States v. Villa-Castaneda*, 755 F. App'x 511, 516 (6th Cir. 2018) (internal quotations and citation omitted). *Miranda* requires that the warning be given in a language which the person can comprehend and on which they can knowingly act. *United States v. Perez-Lopez*, 348 F.3d 839, 848 (9th Cir. 2003). The waiver inquiry is conducted primarily from the perspective of the police, meaning that if the police have no reason to believe that the person misunderstood the warnings, then there is no basis for invalidating the *Miranda* waiver. *Villa-Castaneda*, 755 F. App'x at 516.

While the United States Court of Appeals for the Sixth Circuit has not outlined specific factors to consider in determining whether a person with a language barrier has knowingly and intelligently waived her rights, it has referred to the factors adopted by the United States Court of Appeals for the Ninth Circuit. *Id.* at 518. Courts are to consider the following factors in weighing the totality of the circumstances:

> (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of [her] rights in [her] native tongue; (3) whether the defendant appeared to understand [her] rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to [her]; and (6) whether the defendant had prior experience with the criminal justice system. [*United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998) (internal citations omitted).]

6

The Ninth Circuit held that the facts surrounding the defendant's interrogation in *Garibay*, 143 F.3d at 539, clearly indicated that he did not understand the nature of the rights he was waiving. Going through the factors, the defendant was not given a written waiver to sign in either English or Spanish—his native language—nor was he advised of his rights in Spanish. *Id.* at 538. A translator was not brought in to help question him. *Id.* There was no evidence that the interrogating agent individually explained each constitutional right to the defendant or repeated the explanation. *Id.* at 539. The defendant had no previous experience with the criminal process, so his personal life experiences did not indicate that he was familiar with his *Miranda* rights and the waiver of those rights. *Id.* There was also testimony that the defendant, in the presence of authority figures, would indicate that he understood what was being said to him in English when he did not. *Id.* When looking at the totality of the circumstances, it was not error to suppress the defendant's statements. *Id.*

On the other hand, the Sixth Circuit determined that the defendant's waiver was knowing and voluntary in *Villa-Castaneda*, 755 F. App'x at 518. The defendant signed the FBI's Advice of Rights

form, he appeared to understand his rights, and he had prior experience with the criminal justice system such that he would be more likely to understand the import of his *Miranda* rights in his non-native language. *Id.* The court held that factor five also weighed in the government's favor because the agents individually advised the defendant of his rights, spending about three minutes reading his rights and several minutes before that getting ready to present the form to him. *Id.* While two factors were not present, the factors served as a guide to the court's inquiry and totality of the circumstances led to the belief that there was a valid waiver. *Id.*

Ms. Yu was arrested on July 16, 2020, and subsequently interrogated. Just like in *Garibay*, there are no factors present that indicate that Ms. Yu knew the nature of the rights she was waiving. Ms. Yu did not sign a written waiver, and she was never given anything in writing that she was required to sign by the law enforcement officers who interrogated her. She also was not verbally advised of her rights in her native language, nor was there a translator present to aid in her comprehension. Looking at whether Ms. Yu's rights were individually and repeatedly explained to her, she was only read her *full* rights that are required by law once. (Exh. A, 15:32-16:10.) One officer even instructed the other officer to read the rights

8

to Ms. Yu because they were never fully read to her. (Exh. A, 15:27.)
These rights were not broken down and individually explained to her.
Instead, they were read fast and continuously with little to no breaks
in between each right. The officer spent less than a minute reading the
rights to Ms. Yu. (Exh. A, 15:32-16:10.)

Ms. Yu's reaction to hearing these phrases shows that she did
not appear to understand her rights. The officers should have known
this, based off her comments, and followed up with clarification to
make sure that she understood. Before the full *Miranda* rights were
read to her, Ms. Yu was notified that she did not have to talk to the
officers, but that they would like her to do so. (Exh. A, 11:45, 14:18.)
The officers told Ms. Yu that if she did talk to them, she had the right
to have an attorney present or call her attorney, and that anything
they discussed could be used in court. (Exh. A, 11:51.) This was
confusing because it sounded like Ms. Yu's communications with her
attorney could only be in the presence of the police, and then these
communications could be used in court.

When asked if she was willing to talk to them, Ms. Yu responded,
"But I have to go with you anyway today, right?" (Exh. A, 14:21.) From
this response, it is evident that Ms. Yu thought that she had to talk to
the officers because she was going with them regardless. One officer

9

told Ms. Yu that if there was something she did not want to answer, then she did not have to answer. (Exh. A, 14:48) Then the other officer asked Ms. Yu if she understood the rights the first officer advised her of before. (Exh. A, 14:53.) Ms. Yu responded, "Yeah," but it is unclear what rights were being referred to and what her response referred to when she answered. (Exh. A, 14:57.)

The only time that Ms. Yu was read her full *Miranda* rights, she said she understood them, but she explicitly hesitated when she said this. (Exh. A, 16:08.) Ms. Yu said, "I . . . I do." (Exh. A, 16:08.) After this happened, she immediately said, "So right now I don't need to argue with you about this decision, right? But I just need to follow your . . . I just need to follow your order, right?" (Exh. A, 16:12.) This highlights that she did not really understand what was going on. Ms. Yu referred to the officer's statements as an "order" that she must follow. The officer replied with, "That is correct." (Exh. A, 16:18.) Ms. Yu had the false impression that she must do as the officers said, which included talking to them. She did not make a knowing and intelligent waiver of her rights because she did not understand both the nature of the rights being abandoned and the consequences of the decision to abandon them.

While the officers were told by Ms. Yu's husband that her English was much faster than his, that does not mean that she had a full understanding of the legal rights being told to her. (Exh. A, 2:58.) One person's perception of another person's language skills does not mean that the police should not make an independent assessment. Ms. Yu had never been arrested before, so she had no prior experience with *Miranda* rights or knowing what they entailed. From the perspective of the officers, they should have known that Ms. Yu misunderstood the warnings based off the comments she made and that she needed a translator. When looking at the totality of the circumstances, Ms. Yu did not knowingly and intelligently waive her *Miranda* rights, so her post-arrest statement must be suppressed.

II.   **The statements that Ms. Yu and Mr. Yang made before they were arrested must be suppressed because they were not given their *Miranda* rights before being subjected to a custodial interrogation.**

As mentioned, *Miranda* requires police officers to advise suspects of their rights before a "custodial interrogation." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). A person is considered "in custody" when there is a "restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (internal quotations and citation omitted). "To answer this question, courts focus on the

11

'objective circumstances of the interrogation,' to determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Id.* (internal citations omitted). Several non-exhaustive factors guide this inquiry, including 1) the location of the interview, 2) the length and manner of questioning, 3) whether the individual possessed unrestrained freedom of movement during the interview, and 4) whether the individual was told he or she need not answer the questions. *Id.* This Court should also ask whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112; 116 S. Ct. 457; 133 L. Ed. 2d 383 (1995).

The Sixth Circuit has emphasized some other factors that may impact the "in custody" analysis:

> An investigator's knowledge of an individual's guilt "may bear upon the custody issue" not simply because the officer possesses incriminating evidence but because he has "conveyed [it], by word or deed, to the individual being questioned," and thus has used the information to create a hostile, coercive, freedom-inhibiting atmosphere. That is why such knowledge is relevant only if (1) it was "somehow manifested to the individual under interrogation" and (2) it "would have affected how a reasonable person in that position would perceive his or her freedom to leave." [*Panak*, 552 F.3d at 469 (internal citations omitted).]

12

The Sixth Circuit held that the defendant in *Panak* was not in custody during the questioning, in part because the officers did not use knowledge of the defendant's guilt against her. *Id.* at 470. The officers never told the defendant that she was in trouble, never told her she was a possible suspect, never asked her any accusatory questions, never told her she was potentially subject to criminal penalties, and never reminded her of any information they may have gathered against her during the office search. *Id.* at 469.

Further, the increasingly accusatory nature of an interview weighs in favor of a finding of custody. *Tankleff v. Senkowski*, 135 F3d 235, 244 (2d Cir. 1998). In *Tankleff*, the United States Court of Appeals for the Second Circuit held that the officers' increasingly hostile questioning transformed an interrogation into a custodial interrogation before the defendant was advised of his *Miranda* rights. *Id.* The officers said that the defendant's story was "ridiculous" and "absurd," and had added that they simply "could not accept" his explanations. *Id.* When looking at these factors, it is apparent that Mr. Yang and Ms. Yu's statements must be suppressed.

### A. Mr. Yang was in a custodial interrogation when he was questioned in the officer's police car.

When the government went to execute a search warrant at Mr. Yang and Ms. Yu's home, officers questioned Mr. Yang in the police car. This was done without giving him *Miranda* warnings beforehand. While he was told that he was free to leave at the beginning of the conversation, there were two officers in the police car questioning him while multiple other officers were conducting a search in his home. The interrogation was almost two hours long, and it was the first time Mr. Yang had an encounter with police officers. Additionally, English is not his native language. A reasonable person, especially someone with no experience in the criminal justice system, would not feel free to leave when they are being questioned like this in a police car.

In this case, unlike *Panak*, the officers did attempt to use incriminating information against Mr. Yang to leverage their authority over him. From the beginning of the questioning, not even six minutes in, the officers were telling Mr. Yang the evidence they had against him. (Exh. B, 5:39.) As the conversation continued, the officers got increasingly accusatory in their tone and questioning, like in *Tankleff.* At about 55 minutes, when they were not satisfied with Mr. Yang stating that he did not log into the alleged computer

14

network, the officers started trying to blame Mr. Yang's thirteen-year-old son. (Exh. B, 55:07.) They told Mr. Yang that they would need to speak to his son after school, and that either his wife or his son was responsible for logging in if it was not him. (Exh. B, 55:44.) The officers became angry that Mr. Yang would not confess.

Another officer joined the interrogation an hour into it. (Exh. B, 1:00:03.) The officers were using the information they purportedly had against Mr. Yang to create a hostile, coercive, freedom-inhibiting atmosphere. (Exh. B, 1:02:39.) No reasonable person would feel free to leave the conversation when multiple officers were becoming aggressive and accusatory, while also accusing and threatening to interrogate the accused's minor child. Especially after hearing that the officers were trying to implicate his wife and son, Mr. Yang felt pressured to answer the questions thrown at him. And he still had not been read his *Miranda* rights.

Deep into the interrogation, the officers started telling Mr. Yang to stop talking when he was trying to answer their questions in a way that did not please them. They continuously tried to control the conversation, making the environment more coercive and straying further away from a natural conversation. When one officer asked Mr. Yang if he knew that he was terminated in the computer database, Mr.

Yang tried answering. (Exh. B, 1:06:15.) Yet the officer told him to stop talking by saying, "Stop, stop." (Exh. B, 1:06:20.) Later on—at multiple points—Mr. Yang tried to talk, and the officer became increasingly condescending in the way he was speaking about the information he claimed to have against Mr. Yang, again telling Mr. Yang to stop talking. (Exh. B, 1:12:40, 1:13:20, 1:22:32, 1:23:24.) A reasonable person would not believe that he was able to leave when he was scolded for merely trying to answer questions.

Another tactic the officers used was to present specific alleged incriminating evidence that they had against Mr. Yang and then tell him that the answers to their questions were either yes or no, not letting him elaborate or say, "I don't know." (Exh. B, 1:10:27, 1:16:12, 1:16:49.) They badgered Mr. Yang to answer in a manner that was acceptable to them by means of intimidation and coercion. The officers also made it clear that they did not believe Mr. Yang's answers or his explanations, including being patronizing about what Mr. Yang's wife said in her interrogation. (Exh. B, 1:27:09, 1:28:12.) When listening to the entire interrogation, it is clear that the officers become increasingly accusatory. This weighs in favor of finding that Mr. Yang should have been advised of his *Miranda* rights.

16

Later on in the day, Mr. Yang had joined the interrogation of Ms. Yu, and the officers became extremely accusatory and aggressive with both Ms. Yu and Mr. Yang when asking about their son. (Exh. C, 2:50:10, 2:51:03.) Any statement he made after he was brought back into his house should also be suppressed because he was not given his *Miranda* rights. When looking at a majority of the factors, like the officers using purported incriminating evidence against Mr. Yang, Mr. Yang being interrogated in a police car, and the interrogation lasting almost two hours, Mr. Yang was in custody. Because he was subjected to a custodial interrogation and was not advised of his rights, his statements should be suppressed.

### B. Ms. Yu was in a custodial interrogation when she was questioned in her home while a search warrant was being conducted.

When looking at the totality of the circumstances, Ms. Yu was subjected to a custodial interrogation. "Even when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual." *Panak*, 552 F.3d at 466. "The number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell—turning an inherently comfortable and familiar environment into

17

one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining." *Id.*

"To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008). "[A] reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search." *Id.* Thus, this Court should not heavily weigh the fact that Ms. Yu was told she was free to leave whenever she wanted because she had nowhere else to go. Ms. Yu was interrogated in her home by two officers while numerous others were searching the remainder of her residence. This persisted for almost three hours. Ms. Yu was not advised of her *Miranda* rights before this interrogation started. Much like with her husband, the officers' tones changed profusely as the interrogation went on.

Although she was in her home and was told she could leave the interrogation when she wanted to, Ms. Yu's freedom was limited so that a reasonable person would not feel free to terminate the interrogation. At 41 minutes into the interrogation, the phone in Ms. Yu's house rang. (Exh. C, 41:20.) Ms. Yu attempted to answer the

18

phone, but both officers interrogating her told her that she had to "stay right here." (Exh. C, 41:30.) Ms. Yu said, "So, I cannot take phone [sic]?" (Exh. C, 41:36.) One officer responded, "No, we can just let that ring for a little bit," to which Ms. Yu said, "So . . . so . . . I, I don't have the freedom right now?" (Exh. C, 41:48.) The officer then said that they had a search warrant for the home where, typically, they like to make sure everything is safe, so Ms. Yu did have some freedom, but it could be uncomfortable for the other officers if she walked by all of a sudden. (Exh. C, 41:53.) The officer stated that if there was something she needed, like water, they could accommodate her, but *right now they were talking to her*. (Exh. C, 42:16.)

While the officer tried to cover his motives by alleging officer safety, he clearly stated that she could not move because they were interrogating her. Of course, an officer could have walked her to the telephone or told the other officers that Ms. Yu was going to use the telephone. But he did not, and the result was that Ms. Yu indicated that she did not feel that she had any freedom because she did not have freedom. This created a coercive, intimidating environment that was custodial, where the officers were detaining Ms. Yu and a reasonable person would not feel free to leave.

19

A salient feature of a "custodial interrogation" is the suspect being "cut off from the outside world." *Miranda*, 384 U.S. at 445. The United States Supreme Court explicitly stated that the law enforcement technique of isolation is perhaps the most crucial factor leading to a person feeling compelled to self-incriminate. *Id.* at 445-446, 449-450. This is exactly what happened when the officers would not let Ms. Yu answer the phone because they were in the middle of interrogating her. And even if it was true that Ms. Yu could not move because of officer safety during the execution of a search warrant, multiple United States Court of Appeals circuits have held that, while these precautions may be necessary, they do not "lessen their tendency to make a reasonable person believe he is in custody." *Craighead*, 539 F.3d at 1086. The United States Court of Appeals for the First Circuit noted the following:

> If the government is correct that the agents' actions were necessary for evidence preservation and officer safety, then it could have chosen to postpone the interrogation until a non-custodial moment, or to Mirandize [the suspect]. Either step would have protected both the defendant's constitutional rights and the officers' legitimate law enforcement needs. [*United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007).]

As the interrogation went on, the officers became increasingly accusatory of Ms. Yu, using purported information against her in

hopes that it would elicit an incriminating response. Fifty-five minutes into the questioning, the officer told Ms. Yu that it was either her or her husband who was making changes to TFF's network, but he was pretty sure it was Ms. Yu because the changes happened when her husband was at work. (Exh. C, 56:02.) Again, the officer said it was either her or her husband who made changes, with his voice taking on a condescending tone indicating that he did not believe what Ms. Yu was saying. (Exh. C, 56:53.) When Ms. Yu stated that it was the company's system that was having problems, the officer said, "No, it's . . . it's not," which explicitly showed that he did not believe Ms. Yu. (Exh. C, 57:15.)

The officer told Ms. Yu that they know a lot of the answers before they even ask the questions, and if Ms. Yu is saying she did not make any changes, then that tells him that it has to be her husband. (Exh. C, 57:30, 57:40.) Then the officer tried to make Ms. Yu feel guilty about allegedly not being honest, stating that if they do not have honesty from someone, it makes the officers do more work and it will go to court, and someone will get in trouble over it. (Exh. C, 57:47.) The officer told Ms. Yu, "You're telling me that it wasn't you, and I don't believe you." (Exh. C, 59:11.) The officer also stated, "And I promise you, if you lie to me right now, I will request as many criminal charges

21

as possible." (Exh. C, 58:47.) No reasonable person would feel free to end the interrogation after receiving this threat from a law enforcement officer. Yet, Ms. Yu was still not advised of her *Miranda* rights.

About an hour into the interrogation, Ms. Yu stated that she felt scared because this was her first encounter with police officers and it involved the officers carrying weapons and searching her house. (Exh. C, 1:00:26.) She said that she was in fear because she was the only person home when the officers pounded on her door and came inside. (Exh. C, 1:01:00.) Ms. Yu said she felt like she was under arrest. (Exh. C, 1:01:25.) The officer told Ms. Yu that he previously told her that she was not under arrest and there was no indication that she was under arrest, so "don't tell me that we made you feel like you're under arrest." (Exh. C, 1:01:46.) Despite the officer telling Ms. Yu that she was not under arrest, "an agent's statement that a suspect is free to leave may have more or less resonance with the suspect depending on whether he can leave the interrogation site and retreat to the safety of his home or whether his home is in fact the locus of police activity." *Craighead*, 539 F.3d at 1088.

Then the officer stated, "You're the one that's lying." (Exh. C, 1:01:53.) Ms. Yu mentioned how they did not let her pick up the phone,

and the officer admitted that they did not let her answer the phone because they did not know who was on the phone or what the person would tell her and they wanted to talk to her *uninterrupted*. (Exh. C, 1:01:58.) Ms. Yu explained how she did not feel comfortable, and the officer said, "We know someone from this home broke the law. That's plain and simple." (Exh. C, 1:02:502, 1:02:38.) Even though the officers told Ms. Yu that she was not under arrest, their words were meaningless when their actions indicated otherwise. "Restraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times." *Craighead*, 539 F.3d at 1085. This is what happened to Ms. Yu. The officers treated Ms. Yu as if she was under formal arrest. This, in combination with their increasingly accusatory tone and use of alleged information against her, would not make a reasonable person feel free to terminate the interrogation and leave.

At almost two hours and 50 minutes into the interrogation, an officer told Ms. Yu that either she was lying to them or her husband was lying to them, but they knew that one of the two was lying. (Exh. C, 2:49:33.) The officers also brought up Ms. Yu's minor son, insinuating that he partook in illegal activity if it was not Ms. Yu or

23

Mr. Yang. (Exh. C, 2:49:39.) Just as they did in Mr. Yang's individual interrogation, the officers started saying their questions could only be answered with a "yes" or a "no." (Exh. C, 2:50:50, 2:51:00.) Mr. Yang had joined the interrogation of Ms. Yu at this point, and the officers became extremely accusatory and aggressive with both Ms. Yu and Mr. Yang when asking about their son. (Exh. C, 2:50:56, 2:51:08, 2:51:33-2:52:45.) When looking at the totality of the circumstances, how the officers treated Ms. Yu during her almost three-hour interrogation would leave no reasonable person with the belief that she could end the interrogation. Therefore, Ms. Yu's pre-arrest statements must be suppressed because she was never advised of her *Miranda* rights.

## CONCLUSION

The right to remain silent and the right to have an attorney are two of the most fundamental rights afforded to criminal defendants by the United States Constitution. After her arrest, Ms. Yu did not validly waive her *Miranda* rights because her waiver was not knowing or intelligent. Further, Ms. Yu and Mr. Yang's constitutional rights were violated when they were not told their *Miranda* rights before they were subjected to custodial interrogations. Accordingly, Ms. Yu and Mr. Yang respectfully request that this Court suppress the statements

that they made to the police before and after their arrest, or, alternatively, order a suppression hearing.

Respectfully submitted,

12/11/2020                          /s/MARY CHARTIER
Date                                Mary Chartier


12/11/2020                          /s/PATRICK O'KEEFE
Date                                Patrick O'Keefe


## Certification of Delivery

I hereby certify that on December 11, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification to parties enrolled through the ECF system. A hard copy has been mailed via the United States Postal Service to those who are not enrolled.

/s/MARY CHARTIER
Mary Chartier
Chartier & Nyamfukudza, P.L.C.
2295 Sower Boulevard
Okemos, MI 48864
Phone: 517.885.3305
Fax: 517.885.3363
mary@cndefenders.com